**PITCAIRN et al. v. PERRY.**

No. 12017.

Circuit Court of Appeals, Eighth Circuit.

Oct. 13, 1941.

Rehearing Denied Oct. 30, 1941.

Wayne Ely, of St. Louis, Mo. (N. S. Brown, J. H. Miller, and R. B. Elster, all of St. Louis, Mo., on the brief), for appellants.

William H. DeParcq, of Minneapolis, Minn. (Samuel Cohen, of Chicago, Ill., and William R. Kirby and Cox, Blair & Kooreman, all of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

The Receivers of the Wabash Railway Company have appealed from a judgment entered on a verdict of the jury in favor of Oliver S. Perry, plaintiff in an action brought to recover damages for personal injuries under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. It will be convenient to refer to the parties as they were designated in the lower court.

Plaintiff was a car inspector of the Wabash Railway Company, employed at the time of receiving his injuries in the railroad yards at Moberly, Missouri. He had performed such work for sixteen years. The yard tracks at Moberly extend in an easterly and westerly direction and are numbered from south to north. On July 12, 1939, eastbound freight train No. 74 arrived at Moberly, at about 10:30 o'clock p. m., and stopped on track 2. It had left Kansas City, Missouri, at about 7:15 o'clock that morning. A door on the north side of a box car immediately ahead of the way car was open when the train arrived at Huntsville, about seven miles west of Moberly. The train crew attempted to close it at Huntsville but did not have sufficient time to do so because another train was passing them. They at that time observed nothing wrong with the door except that it would not close. Box car doors, even when new, frequently stick or bind, and it is occasionally necessary to use a crowbar for the purpose of closing them. This it is said, does not necessarily indicate that there is anything wrong or defective about the door. On each car door there are two hangers, which are fastened to the door with four bolts, each going into the door, and the wheel of the hanger rests on a track which is a strip of metal. The car frame holds the door onto the side of the car by means of a strip of metal extending up behind the track. The door is prevented from coming off at the top by a strip of metal that extends outward from the top of the car and then downward, and another strip of metal which extends inward from the top of the car door and upward so that these two strips of metal engage each other in such a way as to prevent the door from coming out at the top. The steel on these strips is about 3/16 or 1/4 of an inch in thickness. Such a door weighs approximately 400 pounds, and is held in place by the hanger at the top. It does not rest on the shoes at the bottom, the function of which is to prevent the door from coming out too far. There is a method of closing box car doors by use of a crowbar. Ordinarily, by placing the crowbar underneath the door and working it up slightly, it will release the door at the top and permit it to close.

On the night in question, Perry and a Mr. Bell were inspecting eastbound train No. 74 as it went by. They had been informed of the open door, and it was the duty and custom of car inspectors and patrolmen to close such doors. They accordingly went to the car, a Wabash automobile car, 14 feet high, where they met a Mr. Shewmon, a special patrolman. They all took hold of this door and attempted to close it. It would roll backwards five or six inches, and then when pushed forward would stick. While they were attempting to do this work, they observed that they were obstructing the view of other employees who were making air tests and passing signals on train No. 96, which stood on track 3, and it was agreed

that Perry and Bell would finish the inspection of train No. 74, while Shewmon went for a crowbar. It took Bell and Perry about ten or fifteen minutes to complete the inspection of train No. 74, and when they finished Shewmon had returned to the open door with a crowbar, and a Mr. Smith, another patrolman, applied the bar behind the door, while Perry and Bell pulled at the handle, but it "stayed stuck." Smith flashed his light behind the edge of the door to see if anything was sticking and then got on top of the car and used his flashlight up there. Perry threw his hammer up to Smith who tapped on the back of the rollers to see if there was anything caught. Bell stood at the front end of the door and took hold of the handle. Shewmon and Smith went to the rear end of the door and started pushing with their hands. Perry stood at the middle of the door and pried up on it with the crowbar. In raising doors with a crowbar, the workman relies upon his sense of touch and takes out the slack. When the slack was taken out, Perry stopped and did not exert any further pressure. When Perry pried upwards, he moved the door forward about a quarter of an inch and then held the bar in place and did not keep on prying but stopped so that the others could push and get the door started to close. He held the bar firm against the side of the car and when the others started pushing and pulling the door moved four or five inches. After the door had thus moved, Smith called "look out." The door fell down on top of Perry, who could not escape it, and he suffered severe back injuries.

At the close of all the testimony defendant moved for a directed verdict. The record does not show whether the court passed upon this motion or not, and the motion is not printed in the record, but in view of the fact that the case was submitted to the jury upon instructions, we are assuming that the motion was denied. The court instructed the jury that if they found that the door would not have fallen from the track if it and its supporting appliances had been in good repair, and that the means of knowing what kind of defect, if any, caused the door to fall was exclusively and entirely within the knowledge and control of the defendants, and was not known by plaintiff or readily determinable by him, they could find defendants liable, unless they believed from other facts in evidence that the injury was not caused by negligence of the defendants.

In seeking reversal, defendants contend (1) the doctrine of res ipsa loquitur does not apply; (2) there was no evidence of negligence; (3) plaintiff assumed the risk of injury; (4) the court erred in not permitting defendants to introduce and read in evidence the original complaint filed by plaintiff; (5) the court erred in permitting plaintiff to testify in rebuttal that he had been examined by Dr. Ambrose at the request of the defendants, and in overruling a motion for mistrial for admission of such testimony and permitting argument in respect thereto by plaintiff; (6) the court erred in denying a motion for a mistrial because of plaintiff's argument that defendants had not called Dr. Streeter; and (7) the court erred in instructing the jury. We shall consider these contentions in the order stated.

 This case is governed by the law as embodied in the Federal Employers' Liability Act. That statute, as interpreted by controlling federal decisions, is the sole authority on the question of liability here. Chesapeake & O. R. Co. v. Kuhn, 284 U.S. 44, 52 S.Ct. 45, 76 L.Ed. 157. Liability under this act can only be predicated upon negligence. This is not seriously contested but the plaintiff contends that the falling of the door under the circumstances disclosed by the record gave rise to a presumption of negligence on the part of the defendant under the doctrine of res ipsa loquitur. Whether the rule or doctrine of res ipsa loquitur is applicable is dependent on the circumstances of each case. Whenever a thing which produces an injury is shown to have been under the control and management of the defendant and the occurrence is such as in the ordinary course of events does not happen if due care is exercised, the fact of the injury itself is deemed to afford sufficient evidence to support recovery in the absence of explanation by the defendant tending to show that the injury was not due to its want of care. As stated by Judge Stone in Terminal Railroad Ass'n v. Staengel, 8 Cir., 122 F.2d 271, 273, opinion filed July 30, 1941: "The rule is applicable if the thing causing the injury was, at the time, under the exclusive control of defendant and the occurrence was such as, in the ordinary course of things, does not happen if the one having such exclusive control uses proper care (San Juan Light & Transit

Co. v. Requena, 224 U.S. 89, 98, 32 S.Ct. 399, 56 L.Ed. 680)."

The contention made by defendants that the doctrine can not be invoked in an action based upon the Federal Employers' Liability Act is determined by this court adversely to their contention in Terminal Railroad Ass'n v. Staengel, supra, where it is said: "Tested by the above considerations on the fact situation above outlined, this is a res ipsa loquitur case. This is directly ruled by Southern Railway [Carolina Division] v. Bennett, 233 U.S. 80, 34 S.Ct. 566, 58 L.Ed. 860, which was a suit under the Federal Employers' Liability Act for the death of an employee (an engineer) by the falling of his engine through a burning trestle."

As defendants' motion for a directed verdict is not contained in the record, we have no way of determining the grounds upon which they predicate that motion, and hence, defendants can not here urge that its denial was prejudicial. The question of the applicability of the doctrine of res ipsa loquitur was, however, preserved by defendants' exception "to the submission of the case on the res ipsa loquitur doctrine. Defendants also except to the court's definition of res ipsa loquitur and to the court's charge explaining to the jury the requirement of the res ipsa loquitur doctrine because the court has omitted to instruct the jury that they must necessarily find that the offending instrumentality here, the door in this case, was in the exclusive control of the defendants, before they could return a verdict for plaintiff."

Defendants requested no instructions. The court instructed that one of the essentials to a verdict in favor of plaintiff was that the means of knowing what kind of defect, if any, caused the door to fall was exclusively and entirely within the knowledge and control of the defendants, and was not known by plaintiff nor readily determined by him.

It is contended by the defendants that they were not in control nor in possession at the time of the accident. The jury might have found from the evidence that at original terminals, such as Kansas City, and on certain repair tracks where cars were placed every fifteen months, defendants maintained equipment and had employees for the discovery of defects and for repairing them. The time allowed an inspector, so called, for inspecting a car at an intermediate point such as Moberly, was about one-half a minute to a car, which also included inspection and making the airbrake tests. It was not part of the duties of the plaintiff to get up on top of the cars nor to inspect the top of the car doors, their hangers or equipment. It was his duty to examine safety appliances, such as grab irons, couplers, air brakes, and similar appliances in view and to cut out certain empty cars. It was his duty to walk along the sides of the cars and inspect the sides and look underneath them at couplers and wheel brakes, grab irons, sill steps and brake riggings. The inspector does much of this work as the cars move along coming into the yards. He stoops down and observes the undercarriage and plays the lights, in case it is dark, along side and underneath the moving car and looks for dragging and defective equipment. The duty and responsibility of inspection of the top of the door was not plaintiff's. His opportunity to observe a defect at night, the car in question being about eleven feet in height, was too limited in time and in physical possibility to make it reasonable to say that he was in control or that he had the means of knowledge of the dangerous condition existing, or its cause. Mere proximity to this car would not imply control over it nor would it detract from the control which the defendants at all times had over the instrumentality. At the time of the accident, plaintiff was only one of four employees attempting to close this door on a car then a part of a moving train which was stopped but temporarily in its movement. The evidence showed that prying up the door as plaintiff did should not cause it to leave the track; that unless the metal parts of the door were so worn and corroded, or unless the wood was so rotten and defective that it would permit a slack of approximately an inch and a quarter, the accident could not have happened. Unless the door had been defective, prying upwards upon it as was done would not make it come off but would cause it to stay in at the top.

The Supreme Court of Missouri in Williams v. St. Louis-San Francisco Ry. Co., 337 Mo. 667, 85 S.W.2d 624, held that where the offending · instrumentality appeared to have been under the control and within the superior knowledge of the employer, justice required that the defendant

be called upon to explain the occurrence and the doctrine of res ipsa loquitur was applied. This superior or exclusive means of knowledge is the basis for adopting the rule of res ipsa loquitur. Noce v. St. Louis-San Francisco Ry. Co., 337 Mo. 689, 85 S.W.2d 637. In Eker v. Pettibone, 7 Cir., 110 F.2d 451, 455, a train was derailed and the engineer killed. The cause of the derailment was left unexplained. The engineer was in control of the locomotive which was derailed. In the course of the opinion it was said: "It [plaintiff] argues here that plaintiff's decedent was in control of the engine and for that reason the doctrine is not applicable. We do not believe the argument is sound. True, the decedent, as the engineer, had control of the speed of the engine, but he had no more control and was no more responsible for the proper functioning of the pony-truck which caused the accident, than was the fireman, brakeman or conductor. * * * That the accident was unusual, there can be no question, and we think it is probable that it was the result of negligence rather than pure accident. Under such circumstances, the law creates an inference sufficient to carry the case to the jury."

A somewhat similar case was before the Supreme Court of New Jersey in Cork v. Lehigh Valley R. Co., 98 N.J.L. 143, 119 A. 88, 89. In that case the plaintiff observed a door in a freight car partly open. It was dark and he endeavored to roll it back for the purpose of determining whether the contents of the car had been disturbed, when the door fell on him, inflicting injuries. In the course of the opinion the court said: "The fact that the car door, when the plaintiff attempted to open it, was so out of repair that it fell from its fastenings, was some proof that there had been a failure on the part of the defendant company, or its agents charged with that duty, to make proper inspection of the condition of the door; and this is especially true in view of the fact that no evidence whatever was offered by the defendant company to show the performance of that duty."

In the instant case, the jury was instructed that if plaintiff's act caused the door to fall, he could not recover and that it was only in the event that it fell because of its defective condition that defendants could be found liable. In Smith v. St. Louis-San Francisco Ry. Co., 95 Kan. 451, 148 P. 759, 763, a case somewhat similar in its facts, the Supreme Court of Kansas said:

"It was the duty of the defendant to see that its cars were in a reasonably safe condition. If it sent the cars out in bad condition, it was negligent somewhere. * * *

"The plaintiff's duty to replace the car door did not imply a duty to repair the rod on which the door rolled, or the hangers by which it was suspended. It was the defendant's duty to see that this rod and these hangers were in proper condition when the car was put into the train."

■■ Did the plaintiff assume the risk? The trial court instructed the jury that the plaintiff did not assume extraordinary risks arising from the negligence of the employer, unless he had actual knowledge of the conditions creating the danger or hazard, and understood or appreciated the risk arising therefrom, or that the risk was so plain and obvious that he was charged with knowledge as a matter of law. This was a correct statement of the law as applied to the evidence. Missouri Pac. R. Co. v. Siratt, 8 Cir., 78 F.2d 253; Davis v. Crane, 8 Cir., 12 F.2d 355. Defendants, however, contend that the risk was assumed because the door hanger was off the track and that Smith, who held to the top of the car, saw it and that Smith reported it. The verdict of the jury, however, determines that plaintiff did not see and that Smith did not tell him, and such finding is sustained by the evidence. Employees with wide experience testified that such an accident had not happened before, even when prying up on the door and one hanger was off the track. It was at least unusual for a car inspector at Moberly to go on top of a car. Perry did not pry the door off. He could not have done so had he tried. The undisputed evidence was to the effect that he took up the slack and held the bar still so that other employees could close the door. He had no way of escape when the door fell. The issue of assumption of risk was one for the jury and their verdict concluded that issue. Davis v. Crane, supra.

As previously noted, the record is such that we can not consider the question of the sufficiency of the evidence but may only consider it in connection with exceptions to the instructions.

■■ It is urged that the court erred in refusing to permit defendants to intro-

duce in evidence the original complaint filed by plaintiff. Rule 14 of this court requires that: "When the error is as to the admission or rejection of evidence, the statement shall quote such evidence with the rulings thereon, giving pages of the printed record where it occurs." We are cited to the instruments but not to the pages of the printed record where the offer and the ruling thereon may be found. We do not think the error was prejudicial. The original complaint did not contain all the allegations contained in the amended complaint, but it was not inconsistent with the allegations of the amended complaint. Be that as it may, it appears that the original complaint was not signed by plaintiff, and it was not shown that he knew its contents. Fidelity & Casualty Co. v. Brightman, 8 Cir., 53 F.2d 161.

■ Defendants filed a motion for the appointment of Dr. Ambrose to make an examination of plaintiff before trial. This proceeding was in accordance with Rule 35 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The doctor made such an examination and furnished the attorneys for each side with a copy of his findings and conclusions. After defendants had closed their case, plaintiff was recalled and testified over objection that at the request of defendants he was examined by Dr. Ambrose. Plaintiff's counsel in his argument referred to the non-production of Dr. Ambrose as a witness; in fact, neither party called Dr. Ambrose. It has been held that a physician making an examination pursuant to an order of the court becomes an officer of the court and he is available to either party as a witness. Defendants so argued to the jury. There is a conflict of authority as to the proper rule applicable. Mr. Wigmore, in his work on Evidence, Sec. 288, 2d Ed., states that the failure to produce an equally available witness is open to an inference against both parties, the particular inference against either depending upon circumstances. See Baker v. Salvation Army, 91 N.H. 1, 12 A.2d 514.

Plaintiff took the deposition of Dr. Streeter, and defendants introduced it in evidence. Dr. Streeter was located at Moberly, 125 miles from St. Louis, where the action was tried, and hence was not subject to subpœna. Plaintiff was a member of the Wabash Employees' Hospital Association, which entitled him to treatment at the hospital in Moberly and to the services of Dr. Streeter, who attended him after the injury. Dr. Streeter testified that he was local surgeon for the Wabash Railway Company. Perry was under his observation from July 12, 1938, to November 8, 1939. Perry was the patient of Dr. Streeter. Plaintiff's counsel argued to the jury that the failure of defendants to call Dr. Streeter as a witness amounted to a failure to dispute plaintiff's claim of injury. The court stated to the jury that the doctor could not have been compelled to come to the trial. Defendants' attorneys said that Dr. Streeter refused to come and they fully argued the point to the jury. Counsel for defendants have presented no assignment of error relative to the extent of the injuries. From the evidence it appears that the injuries were serious. The defendants used the doctor's deposition. We can scarcely see how it can be said that the defendants were prejudiced and their motion for mistrial was properly overruled. Fidelity & Casualty Co. v. Niemann, 8 Cir., 47 F.2d 1056. The testimony in any event did not go to the question of liability but only to the extent of injury.

The arguments of defendants relative to the instructions are based upon the non-applicability of the res ipsa loquitur doctrine, and hence are disposed of by what we have already said.

The judgment appealed from is therefore affirmed.